IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


JAMES B. MASELLI,

      Plaintiff,

vs.                                    Case No.  1:07cv91-MP/WCS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and the claim be remanded to obtain a consultative neurological examination and testimony from a vocational expert.

**Procedural status of the case**

Plaintiff, James B. Maselli, applied for supplemental security income benefits. Plaintiff was 45 years old at the time of the administrative hearing, R. 203, 208, has a 12th grade education, R. 217, and has past relevant work doing yard work and work in

nurseries and a retail business, all in the remote past.  R. 219, 224.  He had not worked

in the prior 15 years at the time of the hearing.  *Id.*  Plaintiff alleges disability due to

injury in 1977 from a gunshot wound to his head, causing severe headaches, dizziness,

lightheadedness, and blackouts three times a day.  R. 214-215.

The Administrative Law Judge found that Plaintiff has the residual functional

capacity to do a full range of light work, with some limitations.  Applying the "grids,"[1] the

ALJ determined that Plaintiff was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at:
http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm.

uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing[2]**

Plaintiff testified at the hearing that he was shot in the head in 1977, when he was 17 years old.  R. 208.  Recent x-rays show that the bullet and metal fragments are still lodged in his head.  R. 210-211.

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, or PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).

Plaintiff said he does not suffer seizures.  R. 209.  He said that since his injury he has been taking Dilantin[3] to prevent seizures.  R. 244.  He said he has

> mostly scorching headaches all the time.  I have a headache like constantly and it's not a small one, it's a, I get real bad headaches all the time. [And] my problem is that sometimes, you know, sometimes I can go a couple of days and I feel just fine and healthy as I'm a normal person. Most days, anywhere from one to three times I can ha–, usually it'll start off with a headache and then most days it'll start off with a real scorching headache and I'll just end up getting, I'll start feeling real dizzy and I'll start feeling lightheaded and then kind of like I'm ready to lose my balance and stuff and my ears start popping and my basic remedy for it is I just immediately like I lay down on the couch and that's when I –

R. 233.  He said that after lying on the couch for "about a half hour or so later on I'll start feeling better."  R. 235.  Plaintiff said that he had fainted numerous times, but the last blackout had been six months earlier.  R. 233-234.  He said that he started to experience a light-headed feeling two or three years after his injury.  R. 241.

Plaintiff said that when he was feeling good, without a headache, he could drive a motor vehicle, but he never drives by himself.  R. 226, 241.  He said he had restless nights, with headaches.  R. 235.  Plaintiff said that if he has a headache during the day, he  would lie around most of the day.  *Id.*  He said he does some housework and yardwork when he feels real good.  R. 236-237.

Plaintiff said he took Advil and Aleve for pain.  R. 243.  He said he did not take prescription pain medications because they made him feel jumpy and unwell.  R. 243.

---

[3] Dilantin is an antiepileptic drug, prescribed to control grand mal seizures (a type of seizure in which the individual experiences a sudden loss of consciousness immediately followed by generalized convulsions) and temporal lobe seizures (a type of seizure caused by disease in the cortex of the temporal [side] lobe of the brain affecting smell, taste, sight, hearing, memory, and movement).  Dilantin may also be used to prevent and treat seizures occurring during and after neurosurgery (surgery of the brain and spinal cord).  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

**Medical Evidence**

The earliest medical record is from an admission to the hospital on January 29, 2003.  Plaintiff was admitted with complaints of pain in the right scapular and central chest for the prior week.  R. 139.  Dr. Richard Martin noted during the admission that Plaintiff had been shot in the head in his teen years and had had surgery for that injury "with essentially no residuals."  *Id*.  The electrocardiogram showed left axis deviation, right bundle branch block, with no acute changes.  R. 140.  The diagnosis was chest pain and cardiomyopathy, with a question of hypertension.  *Id*.  Plaintiff was given Vasotec[4] and his blood pressure came down.  R. 138.

Plaintiff was seen by Dr. Martin on June 10, 2003, complaining of back and chest pain; the diagnosis was back pain.  R. 128.  Lortab[5] and Ambien[6] were prescribed.  *Id*.

There is an undated medical record from Dr. Martin that appears to be after June 10, 2003, due to the order of this note in the record.  R. 127.  Plaintiff complained of anxiety and a headache.  *Id*.  The diagnosis was anxiety.  *Id*.  Xanax[7] and Lortab were prescribed.  *Id*.

---

[4] Vasotec is a high blood pressure medication known as an ACE inhibitor. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[5] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[6] Ambien is indicated for short term insomnia.  PHYSICIANS' DESK REFERENCE (2005).

[7] Xanax is prescribed for management of anxiety disorder and for short-term relief of the symptoms of anxiety.  PHYSICIANS' DESK REFERENCE (2005).

Plaintiff was seen again by Dr. Martin on December 11, 2003, for a "non-productive" cough.  R. 126.  The diagnosis was bronchitis and it appears from the notes that Robitussin was prescribed.  *Id.*

On July 20, 2004, Dr. Martin filed out a disability questionnaire after an examination of Plaintiff that day.  R. 125.  He said that Plaintiff did not experience chest discomfort of ischemic or non-ischemic origin.  *Id.*  He said that Plaintiff's ability to function was affected by dizziness and headaches.  *Id.*  On the same date, Dr. Martin filled out another questionnaire.  R. 124.  Dr. Martin checked the "yes" box for a mental impairment, noting dizzy spells, headache, and gunshot wound (GSW) of the brain.  *Id.* and R. 122.

On September 13, 2004, Dr. Martin again saw Plaintiff.  R. 121.  Plaintiff reported that he had fallen and injured his back, legs, and feet.  *Id.*  The cause of the fall is not noted.[8]  *Id.*  Lortab was prescribed and an x-ray of Plaintiff's feet and ankles was ordered.  *Id.*

On November 29, 2004, Dr. Martin filled out another report for the Florida Department of Health.  R. 120.  He noted that Plaintiff was taking Vasotec and Dilantin.  *Id.*  He again said that Plaintiff had a history of dizziness and a gunshot wound to the brain.  R. 119.  He reported that Plaintiff "functions OK but has dizzy spells and headaches [that] interfere with working."  R. 118.

---

[8] Plaintiff testified that he fell due to a dizzy spell, but that cause was not noted by Dr. Martin.  R. 233-234, 121.

On August 3, 2005, Dr. Martin prescribed Dilantin and meclizine hydrochloride.[9]

R. 117.  On August 4, 2005, x-rays of Plaintiff's head revealed a 9 x 10 x 11 mm "dense

metallic object at the superior aspect of the right petrous ridge," a 2.5 x 3.5 cm hole in

the right front skull, and "several tiny metallic fragments in this region," all "consistent

with a remote gunshot wound to the right frontal region."  R. 116.  Otherwise, the exam

was negative.  *Id.*

On August 11, 2005, Dr. Martin wrote:

> James suffered a serious gun shot wound to the head in 1977.  He has
> chronic head aches & dizzy spells relating to this injury.  It is my opinion
> that he receive disability based on the reason above.

R. 115.

Plaintiff had a mental status consultative examination on July 13, 2004.  R. 161.

The examination was by Andres Nazario, Ph.D.  R. 164.  Plaintiff drove himself to the

interview.  R. 161.  Plaintiff reported that he had had "massive headaches for years."

*Id.*  He also said he passes out at least once or twice a week, and sometimes three

times a day.  R. 161-162.  Plaintiff said that he received Xanax for headaches, but did

not take it very often.  R. 162.  Dr. Nazario found noted nothing abnormal in describing

Plaintiff's mental status, and he had no mental diagnosis to make; that is, Dr. Nazario

found no mental impairment.  R. 163.  He thought that Plaintiff might "benefit from a

neurological evaluation given his reported headaches, and associated symptoms."  *Id.*

On July 23, 2004, Plaintiff was examined on a consultative basis by Robert A.

Greenberg, M.D.  R. 179.  Plaintiff reported that he suffered "daily, severe, generalized

---

[9] Meclizine hydrochloride is an antihistamine used in the management of nausea,
vomiting, and dizziness associated with motion sickness and of vertigo associated with
disease affecting the vestibular system.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

headaches that last several hours at a time, as well as frequent dizzy spells and occasional blackouts that occur on the average of two times per week." *Id.* Dr. Greenberg speculated that Plaintiff's high blood pressure might be causing his headaches and dizziness. *Id.* Dr. Greenberg recommended an ophthalmology examination to rule out glaucoma due to the redness of Plaintiff's eyes. *Id.* Dr. Greenberg's diagnostic impression was hypertension, chest pains typical and atypical for angina pectoris, and "status post gunshot wound to the head at age 19 [sic, 17], resulting in severe, generalized headaches, dizzy spells, and blackout spells." R. 180.

**Legal Analysis**

### Whether the ALJ properly evaluated the opinion of the treating physician

Dr. Martin expressed the opinion that Plaintiff is disabled. The Administrative Law Judge stated: "Limited weight is assigned to the opinions of Dr. Martin as they are inconsistent with his own office notes as well as the objective clinical laboratory findings of record." R. 19. The ALJ found that:

> [Plaintiff's] mental impairment results in no restrictions of activities of daily living; no difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace.

*Id.* Plaintiff contends that the ALJ erred by failing to give adequate reasons, supported by substantial evidence, for discounting Dr. Martin's opinion.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide *a detailed, longitudinal picture* of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2) (emphasis added).[10]

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence. Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992). This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004). See also, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion). The ALJ must clearly articulate the reasons for rejecting the treating physician's opinion. Id., at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . . Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

On the whole, the ALJ's conclusions regarding the opinion of Dr. Martin are supported by substantial evidence in the record. A fair reading of Dr. Martin's opinion is

---

[10] Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

that he thought that Plaintiff's headaches, dizziness, and blackout spells would preclude all work.  Plainly there is objective evidence of a cause of Plaintiff's symptoms:  the remains of the bullet in his head.  The crucial issue, however, is how often and to what degree does Plaintiff suffer blackout spells and severe headaches, and how does this diminish Plaintiff's residual functional capacity for work.  Dr. Martin did not describe the nature of such limitations in his medical notes, and his opinion does not address any aspects of Plaintiff's residual functional capacity.  His opinion as to disability is a conclusion without medical explanation.   Dr. Martin's treatment encounters are scant, and headaches and fainting spells are not mentioned over a significant period of time. Finally, and of greatest importance, there is no evidence that Dr. Martin prescribed any significant treatment regimen for Plaintiff's headaches over a significant period of time. In other words, there is not a "detailed, longitudinal picture" of Plaintiff's impairments. "The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."  Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).  The ALJ followed the law and gave adequate reasons for discounting the conclusory opinion of Dr. Martin.

### Whether the ALJ properly evaluated Plaintiff's testimony as to the frequency, duration, and intensity of his symptoms

Plaintiff argues that the ALJ improperly evaluated his testimony.  Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling (SSR) 96-

8p,[11] p. 4.  Pain and other symptoms may affect either exertional or non-exertional

capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations

omitted).  "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ

must either explicitly discredit such testimony or the implication must be so clear as to

---

[11] Social Security Rulings are found at:
http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

amount to a specific credibility finding." *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

The Administrative Law Judge determined that Plaintiff's testimony as to pain, dizziness, and frequent blackouts was only "partially credible." R. 20. He gave the following reasons for this conclusion, considered in sequence.

First, He determined that Plaintiff's description of his symptoms was "not supported by objective clinical and laboratory findings of record." This determination is supported by substantial evidence in the record. While there is evidence of a significant head wound, there are no objective clinical or laboratory findings, nor of a lengthy treatment history, to support Plaintiff's testimony concerning his experience of headaches, dizziness, and blackouts. Plaintiff testified that he began to "feel lightheaded" just a few years after the gunshot wound, in 1977, yet the records of treatment from Dr. Martin go back only to 2003. One would expect a much more developed medical record, perhaps with objective clinical and laboratory findings, for a 20 year history of such serious symptoms. Headaches are often treated and treatable with medication.

Second, the ALJ discounted Plaintiff's testimony due to Plaintiff's admitted activities of daily living. R. 20. He noted that Plaintiff reported "driving, running errands, cooking, shopping, performing household chores, using the computer." *Id.* This is not substantial evidence in the record to discredit Plaintiff's testimony. After all, Plaintiff said that he was completely normal when he was not suffering from a headache, dizziness, or a blackout. Moreover, the activities he described were only sporadically performed. Of course, where continuously performed activities of daily living clearly contradict a

claimant's testimony, then such activities might be substantial evidence to disbelieve the claimant's testimony, but sporadically performed activities do not constitute such substantial evidence. <u>Ross v. Apfel</u>, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

The third reason for discounting Plaintiff's testimony was that during the hearing, the ALJ observed "the claimant's full attention, appropriate manner and appropriate responses to questions."  R. 20.  He said that "the claimant appeared with a normal mood, answered questions candidly, and appeared to be able to concentrate and answer questions adequately."  *Id.*  "He was able to attend the hearing proceedings

closely and fully, without any noted distraction and showed no overt pain behavior." *Id.*

"[N]or did the claimant display any side effects at the hearing."  R. 21.

It is not appropriate for the Administrative Law Judge, who is not a medical

expert, subjectively to arrive at an index of traits which he expects the claimant to

manifest at the hearing, and then to deny the claim when such traits are not observed.

Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).  The Eleventh Circuit has

termed this "sit and squirm jurisprudence," and forbids that this method of analysis be

used.  McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen,

821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir.

1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and

appearance during the hearing as long as this is not in lieu of consideration of the

medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985);

Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's

mere reliance on his observation of a claimant during a hearing as the only basis upon

which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

It is unnecessary to determine here whether the ALJ strayed into forbidden

territory, however, as the particular observations he made are not substantial evidence

to discredit Plaintiff's testimony.  Plaintiff admitted that he functioned without any

impairment if, at that particular moment, he was not experiencing a headache,

dizziness, or a blackout.  Plaintiff does not claim disability from an impairment that is

continuously present and active.  It would have been impossible for the ALJ to

determine whether Plaintiff's demeanor at the hearing was merely an interlude between

attacks or was simply Plaintiff's normal functional capacity.  The ALJ's observations at

the hearing, therefore, are not substantial evidence in this record to discredit Plaintiff's testimony.

The fourth basis for disbelieving Plaintiff was that the "severities of his allegations of physical and psychological symptoms are not supported by or consistent with the objective findings of consultative examiners, Drs. Nazario and Greenberg." R. 20.  This basis for only partially crediting Plaintiff's testimony is supported by some evidence in the record.  While both consulting physicians appeared to believe Plaintiff's subjective complaints, or at least accepted them at face value, neither made any *objective* findings supportive of Plaintiff's subjective complaints.  Still, the evidence is not substantial evidence.  The only way that either could have made an objective finding confirming the existence of the symptoms would have been if Plaintiff had experienced the symptoms in his presence.

The final basis for rejecting Plaintiff's testimony is the recitation set forth above, of the lack of evidence elsewhere in the medical record.  The ALJ noted that Plaintiff had not had any mental health treatment or therapy other than prescribed anti-depressants. R. 21.  Upon admission to the hospital in 2003, Dr. Martin noted a history of "no residual neurological damage" from the gunshot wound.  *Id.*  There were no reports of adverse side effects, apparently referring to prescribed medications, from treating physicians.  *Id.*  Plaintiff had been treated conservatively and had not taken any narcotic pain relieving medication.  *Id.*  While he testified that he did not take such medication because it made him feel badly, there is no note from his treating physician concerning the ill effects of pain relieving prescription medication, and no series of notes trying out different kinds of prescription medications.  Finally, "the record fails to show

such marked diminished range of motion, sensory and/or neurological deficits . . . as would accompany the alleged impairments."  *Id.*  All of these findings are supported by substantial evidence in the record discussed above.

In summary, while the second, third, and fourth reasons given for discounting Plaintiff's testimony are not based upon substantial evidence in the record, the first and fifth reasons have the support of substantial evidence.  Those reasons, standing alone, are adequate for the conclusion drawn.  Consequently, the ALJ correctly followed the law and his determination as to the weight to be given to Plaintiff's testimony is supported by substantial evidence in the record.

### Whether the ALJ erred at step 5 in applying the "grids" to make his determination

Since the ALJ determined that Plaintiff has no past relevant work, R. 21, he necessarily had to decide this claim at step 5 of the analysis.  Plaintiff contends that the "grids" should not have been used, given the number and kind of limitations found by the ALJ.

Regarding the "grids:"

An ALJ has the obligation of developing a full and fair record regarding the vocational opportunities available to a claimant.  The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture.  In appropriate circumstances, the grids may be used in lieu of vocational testimony.  However, " '[e]xclusive reliance on the grids is not appropriate either when the claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.' "  Ordinarily, when non-exertional limitations are alleged, vocational testimony is used.  *See Cowart v. Schweiker*, 662 F.2d at 736; *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986) ("When there have been non-exertional factors (such as depression and medication side effects) alleged, the preferred method of demonstrating that the claimant can perform specific

work is through the testimony of a vocational expert.").   "It is only when
the claimant can clearly do *unlimited* types of light work,
. . . that it is unnecessary to call a vocational expert to establish whether
the claimant can perform work which exists in the national economy."

Allen v. Sullivan, 880 F.2d 1200, 1201-1202 (11th Cir. 1989) (most of the citations

omitted, emphasis added).

The "grids" may be used by the Commissioner "only when each variable on the

appropriate grid accurately describes the claimant's situation." Walker v. Bowen, 826

F.2d 996, 1003 (11th Cir. 1987).  There are four variables:  age, education, past work

skills, and physical exertional requirements specified for the category of work

(sedentary, light, medium, and heavy).  Heckler v. Campbell, 461 U.S. 458, 461-462,

103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).  "Exclusive reliance on the grids is

appropriate in cases involving only exertional impairments (impairments which place

limits on an individual's ability to meet job strength requirements)." Foote v. Chater, 67

F.3d 1553, 1559 (11th Cir. 1995), *citing* Campbell.

As noted from the Allen case quoted at length above, a distinction is made

between exertional and non-exertional limitations.

Exclusive reliance on the grids is not appropriate either *when a claimant is
unable to perform a full range of work at a given functional level* **or** *when a
claimant has non-exertional impairments that significantly limit basic work
skills*. . . .  The grids also may not be used when the claimant's non-
exertional impairments are severe enough to preclude a *wide range of
employment at the level indicated by the exertional impairments*. . . .  Non-
exertional impairments include "postural and manipulative limitations, and
must be considered in determining a claimant's residual functional
capacity."  20 C.F.R. § 416.945(d).

Walker v. Bowen, 826 F.2d at 1002-1003 (emphasis added); Phillips v. Barnhart, 357

F.3d 1232, 1242 (11th Cir. 2004).

Exertional limitations should be considered first.

The first condition that requires the ALJ to consult a vocational expert is when the claimant's exertional limitations prevent the claimant from performing a full range of employment.  *This Court has interpreted a "full range of employment" as being able to do 'unlimited' types of work at the given exertional level.*

Phillips v. Barnhart, 357 F.3d at 1242 (citations and footnote omitted, emphasis added). "Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.*, n. 11 (citations omitted).

The second condition considers non-exertional limitations.  Despite the name, non-exertional limitations also include some exertional limitations.  "Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, *and all physical limitations that are not included in the seven strength demands*."  Phillips v. Barnhart, 357 F.3d at 1242, n. 11 (citations omitted, emphasis added).  "When considering [a claimant's] nonexertional limitations, the ALJ need only determine whether [the claimant's] nonexertional impairments *significantly* limit her basic work skills."  *Id.*, 357 F.3d at 1243 (citations omitted, emphasis added).  This means "limitations that prohibit a claimant from performing 'a wide range' of work at a given work level."  *Id.*

The phrase "full range" of work, which applies to exertional impairments (the seven strength categories) and the phrases "significantly limit her basic work skills" or "limitations that prohibit a claimant from performing 'a wide range' of work at a given work level," both of which apply to non-exertional impairments, seem to have been

equated in the case law.  For example, in <u>Passopulos v. Sullivan</u>, 976 F.2d 642 (11th

Cir. 1992), the court said:

> This court has recognized that the grids may be used in lieu of vocational
> testimony on specific jobs if none of the claimant's *nonexertional*
> impairments are so severe as to prevent a *full range* of employment at the
> designated level.

976 F.2d at 648 (citations omitted, emphasis added).  <u>Passopulos</u> said that the issue

was whether the claimant's nonexertional impairments would "erode" the claimant's

"ability to perform a *full range* of light work."  *Id.* (emphasis added).

The Administrative Law Judge found that Plaintiff has both physical and mental

limitations.  He found that Plaintiff:

> *can occasionally climb, balance, stoop, crouch, kneel and crawl.*  He has
> no manipulative, visual or communicative limitations.  *He should avoid
> hazards (such as machinery, heights, etc.)*  The claimant *occasionally
> experiences pain and anxiety resulting from headaches, which might affect
> his ability to understand, remember and carry out complex or detailed
> instructions.*

R. 18 (emphasis added).  None of the limitations identified by the ALJ involve the seven

strength demands for an exertional limitation.  The Administrative Law Judge

determined, however, that the "grids" were appropriate because Plaintiff "has no

substantial loss of ability to perform any of the basic mental work-related activities of his

past relevant unskilled work."[12]  R. 22.  He concluded that:  "The additional limitations

have little or no effect on the occupational base of light work . . . ."  *Id.*  The ALJ found:

> The claimant in this case has the occasional limitations of his ability to
> understand, remember and carry out detailed instructions but no loss of
> ability to meet the basic work-related activity of understanding,

---

[12] The ALJ probably meant that Plaintiff had no substantial loss of ability to do any
sort of light unskilled work, given the fact that Plaintiff had no "past relevant work" as
that term is defined by the Commissioner.  R. 21.

remembering and carrying out simple instructions or performing simple, repetitive tasks.

R. 22.

In <u>Marbury v. Sullivan</u>, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant could do a "wide range of light work."  957 F.2d at 839.  He also found that the claimant could not work around dangerous machinery or at unprotected heights.  *Id.*

The court held that a remand was required:

> Under the ALJ's findings it is evident that claimant was not able to do *unlimited* types of light work, because he was precluded from work around unprotected heights or dangerous moving machinery.  Expert testimony was therefore required to determine whether Marbury's limitations were severe enough to preclude him from performing a wide range of light work. An ALJ's conclusion that a claimant's limitations do not significantly compromise his basic work skills or are not severe enough to preclude him from performing a wide range of light work is not supported by substantial evidence unless there is testimony from a vocational expert.  It was therefore error to rely upon the grids.

*Id.* (emphasis by the court, citation omitted).

Here, the ALJ found that Plaintiff can only occasionally climb, balance, stoop, crouch, kneel and crawl, must avoid hazards (such as machinery and heights), and occasionally experiences pain and anxiety resulting from headaches, which might affect his ability to understand, remember and carry out complex or detailed instructions.  The case at bar, therefore, would seem to be indistinguishable from <u>Marbury v. Sullivan</u> and, by force of that decision, a remand would required for vocational testimony.

Another helpful case is <u>Allen v. Sullivan</u>, *supra*.  There, the ALJ had found that the claimant could *not* perform a "full range" of light work.  880 F.2d at 1202.  Significant non-exertional impairments (dysthymic disorder, borderline mental retardation) were found to exist.  *Id.*  The court determined that, given these findings, it was "clear that

appellant is not capable of performing *unlimited* types of light work."  *Id.*, (emphasis by the court).  The court quoted <u>Ferguson v. Schweiker</u>, 641 F.2d 243, 248 (5th Cir. Unit A 1981), for the rule that:  "It is only when the claimant can clearly do *unlimited* types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy."  *Id.*

Defendant argues, however, that the non-exertional limitations identified by the ALJ do not preclude a "full range" of light work, citing to Social Security Rulings.  Doc. 24, pp. 11-12.  The Commissioner has concluded in Social Security Rulings that an inability to climb ladders, balance on slippery or moving surfaces, crawl, kneel, crouch, or stoop more than occasionally is not required in most sedentary or light exertional jobs.  SSR 83-14 (inability to ascend scaffolding or crawl does not affect most light work); SSR 85-15 (inability to climb and balance, crawling, or kneel, not required in most light work); SSR 95-9p ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").

Likewise, the limitation that Plaintiff avoid hazards, such as machinery or heights, due to the risk of fainting, has been ruled to be a non-exertional limitation that does not substantially erode the occupational base.

> A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exist[s] at all exertional levels.

SSR 85-15.  Similarly, the Commissioner has also ruled that unskilled work does not require the ability to understand, carry out, and remember more than "simple instructions."  SSR 85-15.

However, the Commissioner has also ruled with respect to sedentary work:

Whether the individual will be able to make an adjustment to other work requires adjudicative judgment regarding factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base; i.e., the impact of the limitations or restrictions on the number of sedentary unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education, and work experience, including any transferable skills or education providing for direct entry into skilled work.  Where there is *more than a slight impact* on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, *the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country*.

SSR 96-9p.  Logically, the same would be true for light work.  If the non-exertional impairment has "more than a slight impact" upon the ability of the claimant to perform a full range of light work, the adjudicator must "cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country."  To fulfill this responsibility, it is possible for the ALJ to "consult various authoritative written resources, such as the DOT, the SCO, the Occupational Handbook, or County Business Patterns."  SSR 96-9p.  Alternatively, the ALJ may call a vocational expert.

In summary, the law governing when the "grids" may be used is not entirely clear.  It is recommended that the court follow the precedent set by Marbury v. Sullivan and remand this case for vocational testimony.  Welch v. Bowen, 854 F.2d 436, 439-

440 (11th Cir. 1988) (where the grids are not appropriate, and the Administrative Law

Judge has not made specific findings as to the availability of particular jobs that exist in

substantial numbers in the national economy which the Plaintiff can do despite his

limitations, the proper course is for the court to remand for such factfinding.); Francis v.

Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985) ("The preferred method of demonstrating

job availability when the grids are not controlling is through expert vocational

testimony.").

That procedure is recommended since this court is bound by Eleventh Circuit

precedent and because the ALJ here identified more than one set of non-exertional

impairments.  Impairments must be considered in combination,[13] and the combination of

impairments identified makes this case more complex than perhaps another case.

Therefore, a remand is required.

### Whether the ALJ improperly denied Plaintiff's request for a neurological examination

I have saved this issue for last because, like the question of whether the "grids"

were applicable, the question of whether a neurological examination should have been

obtained is a close one.  Dr. Nasario, a psychologist, recommended that Plaintiff have a

neurological examination.  R. 164.  Plaintiff made his own request for an examination at

the hearing.  R. 214.  Plaintiff contends that it was error not to grant this request.

Plaintiff argues that "the ALJ did not have sufficient facts regarding Mr. Maselli's

---

[13] All impairments, whether "severe" or not, must be evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).

'massive headaches' upon which to make an informed decision."  Doc. 19, p. 15.

Plaintiff notes that Dr. Greenberg fully credited Plaintiff's description of the frequency

and severity of his symptoms.  *Id.*, p. 16.

The ALJ acknowledged the recommendation of Dr. Nasario, but also noted that

Dr. Greenberg did not recommend such an examination.  R. 20.  The implication was

that since Dr. Greenberg did not mention it, a neurological examination was not needed.

The ALJ further found no evidence of neurological deficits from the gunshot wound:

> Although, the claimant underwent surgical intervention for the gunshot
> wound to his head, the record shows there was no residual neurological
> damage (Exhibit 2F).  There have been no reports of adverse side effects
> made to treating physicians, nor did the claimant display any side effects
> at the hearing.  In deed [sic], despite allegations of severe pain the record
> does not demonstrate that the claimant's medical care involved anything
> more significant than conservative treatment; nor does the evidence show
> the claimant has taken any narcotic based pain relieving medications.
> Moreover, the record fails to show such marked diminished range of
> motion, sensory and/or neurological deficits, shortness of breath, and
> significant cardiovascular insufficiency, as would accompany the alleged
> impairments.

R. 21.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the

ALJ's duty to investigate the facts and develop the arguments both for and against

granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085,

147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct.

1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary

proceeding, the ALJ has a *basic* obligation to develop a full and fair record."  Graham v.

Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v.

Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not

the claimant is represented.  <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995)
(citation omitted).  Additional evidence, however, is not necessary if the record contains
sufficient evidence to make a decision.  <u>Wilson v. Apfel</u>, 179 F.3d 1276, 1278 (11th Cir.
1999).

Many of the reasons for not procuring a neurological examination are supported
by substantial evidence in the record.  When Plaintiff was admitted to the hospital with
chest pains on January 29, 2003, his treating physician, Dr. Martin, said that his 1977
gunshot wound was "without residual neurologic damage."  R. 137.  Dr. Nazario
recommended a neurological consultation, but otherwise found no mental impairments.
Dr. Greenberg found no neurological deficits upon examination of Plaintiff.

Nonetheless, Dr. Greenberg found that Plaintiff was "status post gunshot wound
to the head at age 19, *resulting in* severe, generalized headaches, dizzy spells, and
blackout spells."  R. 180 (emphasis added).  In other words, Dr. Greenberg fully credited
Plaintiff's reports of his symptoms and determined that the cause was the gunshot
wound.  Dr. Nazario recommended that there be a neurological examination.  Both
strongly suggest the need for a neurological examination.  Since a remand is needed for
vocational testimony, the better course is to also require a neurological examination as
well.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge
correctly followed the law and are based upon substantial evidence in the record in part,
but erred in failing to obtain a consultative neurological examination and testimony from

a vocational expert.  The decision of the Commissioner should be reversed and

remanded to obtain this evidence and to reconsider the claim in light of this evidence.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED and REMANDED**

to obtain a consultative neurological examination and testimony from a vocational

expert.

**IN CHAMBERS** at Tallahassee, Florida, on January 30, 2008.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**